I believe our point of departure here is that at the time that Williams v. Illinois was the law of the land at the time this case was decided. In fact, it was remanded from the United States Supreme Court specifically for reconsideration in light of Williams. And the question before this Court today, in my opinion at least, is was the State Court's unreasonable. And the opinion of the Court of Appeal half-heartedly acknowledged that the analyst's report should not have been admitted, but that it was harmless because Reynolds' testimony in the Court's view was properly admitted and the report  was admitted as a business record over a Crawford injection. So we can't challenge  I'm sorry. You don't challenge Reynolds' testimony, right? Pardon me? You don't challenge the testimony? Oh, from the beginning the challenge has been to Reynolds' testimony to the contents of a report that we could not cross-examine the person that the analyst that wrote the report. From the very beginning, starting in the trial court it was admitted as a business record over a Crawford injection. So way back at trial they already had Crawford. And then from there, she, Ms. the public defender, Ms. I can't remember her name now after all these years, she objected again to Reynolds' testimony, but it was admitted as basis evidence. But the report itself was admitted for the truth of the matter. Now, recently in Sanchez, our California Supreme Court decided that there was no, relying on Williams, relying on the five justices in Williams that agreed on one point at least that there was no difference between basis evidence and evidence admitted for the truth of the matter. So looking at that, we say, well, the other side of the story is that the other people in Williams, the other justices that voted to affirm, distinguished that it was a judge trial, that there had been no suspect. And what Lombosto's, the analyst in that case, was testifying to, she did her own work. She made her own conclusion. She was just testifying to a little piece of a report that, on which she then conducted her own match. In this case, we have a match by an analyst that did no work. She didn't even oversee the work. And I'd like to save three minutes for rebuttal unless the Court has questions. Okay. Thank you. May it please the Court, Deputy Attorney General Mary Sanchez, on behalf of Respondent, Petitioner is not entitled to federal habeas corpus relief because the California Court of Appeals decision was not an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Opposing Counsel cites a recent decision by the California Supreme Court, People v. Sanchez, but that decision can have no application here under the AEDPA. It is the holdings of the United States Supreme Court that determined whether the decision of the California Court of Appeal was reasonable or not. Here in the last Barba decision, Barba IV, the California Court of Appeals made a plurality decision where the United States Supreme Court held that out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for the truth and thus fall outside the scope of the confrontation clause. Now, the California Court of Appeal found that the confrontation clause, but it found that it was harmless error because Dr. Reynolds herself offered her own independent testimony. And how did she derive that testimony? That testimony... She didn't conduct the test, right? That's correct. Ms. or Dr. Wong, I don't know whether she should act or not, but anyway, this other person conducted the report. So how could Reynolds testify independently? What she did here was she brought in the entire case file, including the machine-generated results, the notes that Ms. Wong took, the DNA report itself that was prepared, and she based her independent expert opinion on those materials. The salient point here is that there is no United States Supreme Court precedent that would have found that to be an error under the confrontation clause. All we have, like I said, is the very deeply fractured Williams opinion that found that the admission of a plurality found that an expert could base his or her opinions on those out-of-court statements. So the issue here, was the California Court of Appeals decision reasonable? It was. Therefore, petitioner here cannot gain any relief under the AEDPA. Ms. Sanchez, what's the significance of the magistrate judge's report and recommendation that was adopted by the California Court of Appeals had indicated that the focus of the arguments were not on the DNA results, but on the contamination issue, and that Reynolds actually testified was helpful, I think, to the defense on that issue, and that the focus of the arguments was not on the admission of the DNA report itself? I think the magistrate's report got that correct, because there are page after page of cross-examination of the LAPD analyst, a fellow by the name of Mastrocovo, who testified at length regarding any possible contamination issue. There was also a great deal of testimony in the form of cross-examination of Dr. Reynolds regarding the possibility of contamination of the control shaft. And she finally admitted, yes, it was possible that it was contaminated. So I think the magistrate's report got those facts clearly was correct. And I think that's important. And that supports your argument about why, in the state's view, it's harmless error. Exactly. That's exactly correct. I guess I'm not sure, why was Reynolds' testimony an adequate substitute for, and again, I don't remember the name of the person who did the original analysis, but if we were, if the defendant wanted to try to expose either incompetence or negligence in some fashion by the person who did the original analysis, I mean, I looked at the, I don't know if we have the notes that Reynolds was looking at, but I looked at the little report, and, I mean, that doesn't disclose enough information for the defense to be able to cross-examine Reynolds on the, you know, how good of a job the original person did, right? I think ultimately there was a very effective cross-examination because it came out that Ms. Wong did not wash the hair prior to performing the DNA extraction procedure. That was very thoroughly gone into by defense counsel. Right, right, right. But hang on, I know that. I'm talking about the actual results that are recorded on the report. And I'm no DNA expert, so if you're able to educate me, that's great. But all it lists is just a series of numbers and letters, right? That Reynolds then says, oh, well, if I compare this to that, it's a match. But how do we know that the original letter and number recorded on the report is correct if we don't have the person who did the original testing there to cross-examine them? That's, I guess, what I'm troubled by. Well, and then let me go back and also talk about that report in just a little bit more detail, and then I'll answer your question. The report itself says that the results are weak results. The chance of a match of an unrelated individual of Hispanic ancestry is one in six million, which is not a very robust number. There were indications that there were artifacts. One in six million? One in six million, yes, that would have the same genetic markers at those six positions. Why is that not a robust number? It sounds pretty robust to me. Well, I would say, you know, I've done a lot of DNA cases on appeal where the numbers go into the billions, the trillions, I mean, up from there. Does it really matter after seven zeros or six zeros, does it really matter how many more you add? I mean, you know, saying one in six million is not robust or something that the jury would ignore, that sounds ludicrous to me. Well, Your Honor, let me then... If you were a jury, I would say, well, one in six million, that's pretty significant. I mean, the fact that there are other tests that show one in six billion or one in six trillion, you know... And the report itself, the numbers went much higher for the Caucasian population and for the African-American population. The one in six million was the low number there. So that's why I bring that up. But I think what's important here is we have to look at the clearly established United States Supreme Court precedent, which allows... Can you actually answer the question, though, that I posed? And that's why it's always a danger when you veer off to say, I'll get to that question later. I'm looking at the report. And so I don't know. Again, I'm not an expert, so I'm hoping that you can help me interpret this. But I look at the, you know, the line across the top. And then it just says there's just a number, 22, 23. And OK, well, I can look at that. I don't need to be an expert. I can look at that and see that, oh, well, that corresponds to the same numbers that Mr. Barba has for that same... I guess it's a particular marker on the DNA. So what I'm saying is fine. Reynolds comes in and says, I'm an expert. And I'm telling you, I look at this thing and there's a match here. But you need to know that the original number recorded for the sample that's called hairs from item number five is actually correct. And so I'm wondering, how was defense counsel supposed to expose any errors in recording the original numbers by cross-examining Reynolds, who didn't actually conduct the test? She just was assuming that those numbers were correct, right? Well, she was. And I think what defense counsel did here was a very fine job of showing that the possibility of contamination, which occurred on the hair shaft, and she could not downplay or dispute the possibility of the contamination of the sample hair. So I think that was an important point that was brought out for the jury. And again, if you're looking at the results, and I'm looking at this test here itself, where it says here... But that one doesn't really address most of the possible errors, like transposition of numbers, misreading of whatever the reports are, lying. None of those things can be exposed by saying, oh, well, there could have been contamination. You know, you're right. But here we are under the AEDPA looking at what's reasonable and looking at clearly established U.S. Supreme Court precedent. There was no unreasonable determination by the California Court of Appeal based on Williams. But in Williams, tell me if I'm misremembering the case. I thought what Williams said is that, let's just take our example here, that sure, a person like Reynolds can come in and give her own independent expert opinion that, for example, the DNA marker at this particular  location, but can only do that by assuming, for the sake of her testimony, that that original data is accurate. And what the prosecution would need to do is bring in someone else to actually lay a foundation to say that, no, that data that the expert gave an independent opinion on actually was accurate. And it seems to me that's what, I guess, seems like it's lacking here, that the prosecution never brought in somebody to show that the original data recorded on the report actually was accurate. Am I getting that wrong? I think so. I think what the plurality found, and again, it was that the expert assumes but does not know to be true that these numbers are correct. But there's no requirement that the prosecution then bring in the analyst. Yeah. Okay. So remind me then, what happened in Williams? Because I thought the prosecution did bring in somebody else to basically show that the facts that the expert was assuming to be true actually were true. Sure. Is that not right? In Williams, it was a DNA rape case, and there was an expert from the Illinois State Police who had a DNA report from Cellmark purporting to show some results, and then he had his own report. And so he was assuming the truth of the Cellmark report. The plurality said that that did not violate the Sixth Amendment Confrontation Clause, and their rationale was that it was not being relied on for the truth of the report. It was being relied on for the truth of the matters asserted in the report. Then there was Justice Clarence Thomas. Thomas's fifth opinion, along with the plurality, he found that there was no Confrontation Clause report, excuse me, error, because the report itself was not formalized enough. So we've got four justices with one rationale. We've got the fifth justice with a different rationale. And then we've got William's, that it can apply beyond the confines of the Williams decision itself. So what we're dealing with here was the reasonableness of the California Court of Appeals harmlessness determination based on, at that time, Williams, which, as I've said, is a deeply fractured opinion and does not offer clearly established law. Therefore, the Court of Appeals determination that the report itself was error, but that Reynolds's testimony was not error is reasonable. And then the Court of Appeal also looked at some of the other evidence that tying him into the circumstances of the crime, including his statements in jail. The knife, the just other circumstantial evidence, and concluded reasonably that there could not be no fair-minded jurors would disagree with their harmlessness determination. Okay. Thank you. The harmlessness determination was based upon the outdated notion that there's a difference between basic evidence and evidence introduced for the truth. And all of the justices in Williams agreed on the fact that there is no difference, that a jury at least can't make that distinction. Maybe a judge can. I just want to say one more thing, that DNA is a wonderful thing. It frees the innocent. It convicts the guilty. But it's only as good as the weakest links in the chain. And in this particular case, we have so many weak links that it needed to be subjected to cross-examination of the person that actually did the work for honesty, which compiles our conclusion. Williams v. Illinois, Crawford, all the line of cases given to us by Justice Scalia, nothing is as good as cross-examination. Williams doesn't have a majority, right? Williams doesn't have a majority on every point, but there's a, you know, it's all of them agreed, even Justice, they all agreed that basis evidence was not, was not something that could just be put before a jury and not accepted as true. So this distinction is a false distinction, and our court, our substantialist court recently recognized that. And so therefore, they were, their interpretation, previous interpretation of Williamson, so far as they did, was erroneous. And they're admitting that now. And there's no possibility of getting relief in the state courts based on that? No, there is not. They denied review, and there's no place further to go after denial of review. This case went back from the U.S. Supreme Court three times, and the last time they denied cert. But, you know, it's one of those things. I mean, I understand the point of view. This is a very difficult case because it's such a horrible crime. But that's why it calls so much more for, you know, judicial courage. I do have a question. Is it your position that Dr. Reynolds' opinion about the 1 in 6 million violated the Confrontation Clause because Dr. Reynolds was relying on the underlying reports to give that opinion? Well, she was more than relying on underlying reports. I mean, the Williams Court, I think, left open a point where, you know, okay, all DNA reports are not necessarily testimonial. But a report that draws a conclusion, like the expert in Williams, she drew her own conclusion, did her own sample that I got. She assumed that the sample she received from Selmark was actually the DNA of the victim, I believe. And then she took and she compared it to a sample of the male donor, and she came to a conclusion. That's not what happened here. What happened here is that Reynolds did nothing. I mean, she didn't even look over the work in the laboratory. She was just the expert that testifies for them. So you can't get at the accuracy of a DNA report until you have the actual person that did the work on the stand. Any further questions? Thank you. Thank you very much.
judges: Kozinski, Watford, Bennett